The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

OLIVIA SELTO, *et al.*,

      Plaintiffs,

v.

CLARK COUNTY, *et al.*,

      Defendants.

NO. 22-cv-5384

**ORDER DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

## I.     INTRODUCTION

On October 29, 2020, Kevin Peterson Jr. was fatally shot by Clark County Sheriff's Department's deputies while he was fleeing during a sting operation designed to arrest him for selling 50 Xanax pills to an informant. In May 2022, Olivia Selto, the mother of Mr. Peterson's child,[1] and his parents, Tammi Bell and Kevin Peterson Sr., sued Clark County, Sheriff Chuck Atkins, Sheriff's Detective Robert Anderson, Sheriff's Deputy Jonathan Feller, and others. The Plaintiffs assert claims of wrongful death and negligence under state law, as well as claims of

---

[1] The parties stipulated and agreed that Plaintiff Olivia Selto is not an individual claimant, but a guardian of a minor child, who is a claimant, and she is a Personal Representative of the Estate. The parties requested that the case caption be amended accordingly. ECF No. 36. The Court GRANTS the stipulated motion, and hereby ORDERS that the case caption be amended so that Plaintiff Olivia Selto is no longer listed as an individual claimant but remains in the case caption as the guardian of minor child K.P. and as a Personal Representative of the Estate.

ORDER DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

- 1

excessive force and unreasonable seizure under 42 U.S.C. § 1983. Currently pending before the Court is Defendants' Motion for Summary Judgment, on all claims against all Defendants, ECF No. 38, and Plaintiffs' Motion for Summary Judgment on Excessive Force Claim Against Defendant Robert Anderson, ECF No. 45. Having reviewed the parties' filings,[2] the record of the case, and the relevant legal authorities, the Court will deny both motions. The reasoning for the Court's decision follows.

## II.   BACKGROUND

In October 2020, the Clark County Regional Drug Task Force set up a "buy-bust"[3] sting operation in a motel parking lot, intending to arrest Kevin Peterson Jr. for the attempted sale of Xanax. Anderson Dep. 59-61, ECF No. 46-1; Anderson Interview 6-7, ECF No. 42-2.  The task force officers identified Peterson as he pulled in and parked from photographs posted on the social media site that had been used for setting up the buy.  Anderson Dep. 58; Anderson Interview 6; Osario Dep. 21, ECF No. 52-2. As Peterson parked, task force officers surrounded the car with lights activated and began to issue commands to Peterson.  Anderson Dep. 67-69; Osario Dep. 32. Detective Osario reported over the radio that Peterson appeared to be reaching for something, and Detective Osario pulled out his gun and shouted for Peterson to show his hands. Osario Dep. 31-33; Anderson Dep 67-68. Peterson exited the vehicle and started running. Anderson Dep. 71, Osario Dep. 33. Detectives Fields and Osario, guns drawn, began to chase him. Anderson Dep. 75-77; Anderson Interview 8-9; Osario Dep. 33-34; Fields Dep. 63-64, ECF No. 52-4. Detective Anderson

---

[2] Defs.' Mot., ECF No. 38; Pls.' Resp., ECF No. 53; Defs.' Reply, ECF No. 59; Pls.' Mot., ECF No. 45; Defs.' Resp., ECF No. 51; Pls.' Reply, ECF No. 56; together with the included declarations and exhibits, including a video exhibit. Defendants also filed notice of supplemental authority, ECF No. 60, referencing a recently decided Ninth Circuit case on qualified immunity, *Smith v. Agdeppa*, --- F. 4th ----, 2023 WL 5600294 (9th Cir. August 30, 2023).
[3] Law enforcement sets up a drug purchase through a confidential informant and then attempts to arrest the drug dealer upon arrival at the location.  Anderson Dep. 40-41, ECF No. 46-1.

ORDER DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

sent out a warning over the radio that Peterson had a gun, and Detective Fields was warned to stop chasing Peterson.  Anderson Interview 8-9; Osario Dep. 34; Anderson Dep. 76 ; Sofianos Dep. 60-61, ECF No. 52-3.  Detective Fields saw Peterson drop a handgun and told Peterson not to pick it up, but Peterson picked up the gun and continued running. Fields Dep. 64; Osario Dep. 34. Detective Sofianos observed Peterson moving south at a jog/fast walk with a gun in his right hand and yelled at Peterson to stop and drop his gun, but Peterson ignored him.  Sofianos Dep. 62-63.

Detective Anderson called dispatch and provided Peterson's vehicle license plate number, requested assistance from patrol officers, and advised that the officers were chasing a black male with a gun. Osario Dep. 36; Anderson Dep. 77; Anderson Interview 9. Detective Anderson then got back in his car and headed in the direction the officers had seen Peterson running. Anderson Interview 10; Anderson Dep. 80-81. The officers temporarily lost sight of Peterson.  Anderson Dep. 71, 78.  After catching sight of Peterson walking and talking on his cell phone, Detective Anderson stopped and exited his vehicle, drew his firearm, and began giving commands to Peterson to stop and to show his hands. Anderson Dep. 86-89; Anderson Interview 10-13.  At one point, Detective Anderson only saw a cell phone in Peterson's hand and thought Peterson might be recording or live streaming on the cell phone. Anderson Interview 11; Anderson Dep. 87-91, 146.

While he was walking, Peterson was FaceTiming on his iPhone with his girlfriend, Olivia Selto, and trying to evade the police. Selto Decl. ¶¶ 5-7, ECF No. 54. Ms. Selto reported that "[h]e was scared and panicky and trying to get away from the officers. Never before had I seen or heard him sound so scared." Selto Decl. ¶ 6.  She then heard tires screeching and FaceTime paused, and it seemed to her that Peterson turned and began running. Selto Decl. ¶ 8.

Thinking Peterson may have ditched the gun, Detective Anderson began closing in when he saw Peterson pull a gun out of his hoodie pocket and begin running again. Anderson Dep. 89-97;

ORDER DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Anderson Interview 12-13.  Anderson yelled at Peterson: "Drop the gun.  Drop the gun or I'll shoot."  Anderson Interview 13; Anderson Dep. 102.

During this time, Deputy Feller responded to the dispatch call for assistance and arrived on the scene.  Feller Dep. 43-52, ECF No. 55-6; Anderson Dep. 101.  Detective Anderson continued to shout commands at Peterson, but Peterson did not respond. Anderson Dep. 99, 102.  Detective Anderson was aware that Detective Brown was in the area, although he wasn't sure where, and he expected other officers to be moving into the area in an effort to contain Peterson. Anderson Interview 13; Anderson Dep. 120.

Peterson continued to ignore Detective Anderson and kept running. Anderson Dep. 102-106; Anderson Interview 14.  Detective Anderson shot between three and five rounds at Peterson's back. Anderson Dep. 102-106; Anderson Interview 14.[4] Detective Anderson thought he'd missed each time because Peterson didn't fall or appear to react. Anderson Dep. 106, 112; Anderson Interview 14. Deputy Feller testified that he saw a gun in Peterson's hand and that at one point, Peterson pointed the gun at him.[5]  Feller Decl. ¶ 4, ECF No. 43; Feller Interview 9, ECF No. 43-1. Deputy Feller commanded Peterson to stop and drop his gun, and when he heard shots being fired, Deputy Feller also fired shots towards Peterson as he was running. Feller Dep. 98-99, 115. Deputy Feller stopped firing when Peterson fell to the ground. Feller Dep. 98-99.

When Peterson fell, Detective Anderson no longer had Peterson in view, and lowered his gun. Anderson Dep. 113; Anderson Interview 14. He then saw Peterson sit up and point something.

---

[4] During his interview after the shooting, Detective Anderson described the situation: "'[T]he suspect's gonna run in north containment, and he's gonna shoot one of 'em.  It's gonna happen.'  So at that point, I kinda just drew the line in the sand and I was – I said, 'I've given suspect enough commands. If he takes another step, I'm gonna shoot him.' Um, he continued to run.  I started shooting.  I recall hearing other shots going off."
[5] The video does not show Peterson pointing his gun and Detective Anderson testified that he never saw Peterson point his gun.  *See* Video, ECF No. 50; Anderson Dep. 101-02.

ORDER DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

- 4

1   Anderson Dep. 113-14, 123-26.  Thinking that Peterson was pointing his gun towards Detective

2   Brown, Detective Anderson fired another volley of shots until he ran out of bullets. Anderson Dep.

3   113, 123-26; Anderson Interview 13.  Detective Brown also fired shots at Peterson.  *See* Gilbertson

4   Expert Rpt. 2, 7 ¶ 9, ECF No. 55-10.

5        Peterson's girlfriend was still on the FaceTime call, could hear Peterson running, and heard

6   the shots being fired.  Selto Decl. ¶¶ 7-12.  "'They're shooting at me,' he said two or three times."

7   Selto Decl. ¶ 8.  After being shot, Peterson lifted his iPhone to show her what was happening, and

8   she then heard "a shocking number of gunshots."  Selto Decl. ¶ 10-12.

9        Peterson was mortally wounded and died shortly thereafter.  The Chief Medical Examiner

10  documented four gunshot wounds, three of which were "back to front" and one "did not have a

11  pathway that was distinctly frontward or backward."  Burt Decl. ¶ 3, ECF No. 40; Wigren Autopsy

12  Rpt., ECF No. 55-9.[6]  Peterson's iPhone was still connected over FaceTime, and one of the officers

13  turned it off.  Selto Decl. ¶¶ 13-15; Osorio Dep. 39; Sofianos Dep. 82-85.  A handgun was found

14  several feet away from Peterson's body.  Sofianos Dep. 82; Osorio Dep. 39; Tencer Rpt. Photos 6-

15  8, ECF No. 55-8.  Plaintiffs allege that Peterson held up his iPhone to show his girlfriend what was

16  happening and never threatened nor pointed a gun at anyone.  Compl. ¶¶ 25, 31, 34, ECF No. 1.

[6] "Back to front" does not mean the entrance wound was on the back of the human body. Burt Decl. ¶ 4. Dr. Burt states that no entrance wounds were in the anatomical region designated as "the back." *Id.*  "One entered the arm, one entered the axilla (armpit), one entered the lateral region of the chest, and one entered the left side of the neck." *Id. See also* Wigren Autopsy Report, ECF No. 55-9 (describing three gunshot wounds course and direction "back to front" and one "front to back").

ORDER DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

- 5

Olivia Selto, who is the mother of Peterson's minor child, together with Peterson's parents, filed suit against Detective Anderson, Deputy Feller, the County, and others.[7] Plaintiffs assert five causes of action:

- First Cause of Action: Wrongful Death – State Claim

- Second Cause of Action: Negligence – State Claim

- Third Cause of Action: 42 U.S.C. § 1983 – Excessive Force and Brutality

- Fourth Cause of Action: 42 U.S.C. § 1983, Unreasonable Seizure

- Fifth Cause of Action: 42 U.S.C. § 1983, Deprivation of Familial Relationship

Compl. ¶¶ 53-72.

In June 2023, the parties filed the pending motions for summary judgment. Defendant moves for summary judgment on all causes of action.  Defs.' Mot. 14, ECF No. 38.  Plaintiffs seek summary judgment solely on the excessive force claim against Detective Anderson based on the first volley of shots fired at Peterson as he was running away.  Pls.' Mot. 1, ECF No. 45.   In Defendants' response briefs, they include multiple motions to strike.  Defs.' Reply, ECF No. 59; Defs.' Opp. 3-6, ECF No. 51.

### III.    SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017) (quoting *United States v. JP Morgan Chase Bank Account No. Ending 8215*, 835 F.3d 1159, 1162

---

[7] Other defendants included Sheriff Chuck Atkins, who was dismissed by stipulation of the parties on November 1, 2022.  *See* ECF No. 15.  The lawsuit also named John and Jane Does 1 through 10, in their official and personal capacities as employees and/or agents of the Clark County Sheriff's Department.  Compl. ¶ 10.

ORDER DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

(9th Cir. 2016)); Fed. R. Civ. P. 56(a). "The moving party bears the initial burden of identifying portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). "If the moving party meets this burden, the opposing party must then set out specific facts showing a genuine issue for trial to defeat the motion." *Id.* If the evidence proffered by the opposing party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the other. *See* Fed. R. Civ. P. 56; *see also Fair Housing Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (noting the court's responsibility to determine whether disputed issues of material fact are present). "[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

The Ninth Circuit Court of Appeals has held "that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly" because the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," and such cases "almost always turn on a jury's credibility determinations." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (citations omitted).

ORDER DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

- 7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## IV.    DEFENDANTS' MOTION

### A.  Motions to Strike

Defendants move to strike nine pieces of evidence raised by Plaintiffs in their opposition to Defendants' motion for summary judgment. Defs.' Reply 2-3. Further, in their response in opposition to Plaintiffs' motion, Defendants also move to strike three documents. Defs.' Opp. 3-6, ECF No. 51. Defendants' motions are evidentiary in nature and are more appropriately raised in the context of trial. The Court has not considered the substance of the documents in the summary judgment context. Defendants' motions are therefore stricken, with leave to raise these evidentiary issues in a pretrial motion.

### B.  Excessive Force and Unreasonable Seizure

Defendants contend that Plaintiffs' Fourth Amendment claims of excessive force and unreasonable seizure should be dismissed on summary judgment. Defs.' Mot. 8-11. The Fourth Amendment protects citizens from "unreasonable seizures" and thus prohibits the use of excessive force by police when apprehending suspected criminals. The constitutional limits on the use of deadly force to prevent a suspect from escaping have been clearly defined since 1985 when the Supreme Court declared that

> [t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so . . . .

*Tennessee v. Garner*, 471 U.S. 1, 11 (1985). The Supreme Court further clarified that a police officer may employ deadly force to prevent the escape of a felon only if the officer "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to

ORDER DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

others . . . or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm . . . ." *Id.* The reasonableness of the officer's decision to use deadly force "depends only upon [his] knowledge of circumstances immediately prior to and at the moment that he had the split-second decision to employ force." *Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996). A court must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)); *see also Monzon v. City of Murrieta*, 978 F.3d 1150, 1157 (9th Cir. 2020) ("We must also view the specific use of force from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.") (citation omitted)). The question on summary judgment "is whether a reasonable jury would necessarily find that [the officer] perceived an immediate threat of death or serious physical injury at the time he shot" the decedent. *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014).

Defendants justify Detective Anderson's use of deadly force as follows: "if you display your hands or a dark object toward police in a manner that mimics a gun, the police act reasonably if they shoot you." Defs.' Mot. 2. Defendants contend that even if Peterson held up his cell phone rather than a gun, knowing that he was armed, the deputies[8] were justified in believing that Peterson was pointing a gun at them, and the shooting was reasonable. *Id.* 2, 8-10 (citing *Hudspeth v. City of Shreveport*, 270 F. App'x 332, 337 (5th Cir. 2008)). According to Defendants' description of events, after Peterson fell, Detective Anderson stopped shooting, then saw Peterson sit up, raise his

---

[8] The Court notes that Detective Brown also shot Peterson, but Detective Brown is not a defendant in this case because he is deceased. *See* Defs.' Mot. 4 n.2; Pls.' Mot. 9 n.3.

ORDER DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

1    right arm with the gun and point it towards him and Detective Brown.  Defs.' Mot. 5.[9]  Detective

2    Anderson then fired again, and Peterson went down. *Id.* Defendants assert that even if the object in

3    Peterson's hand was a cell phone, Peterson was holding it as if it were a gun, and under these

4    circumstances, it was reasonable for Detective Anderson to shoot. *Id.* at 8-10 (citing cases in which

5    police had a mistaken, yet genuine, fear that a person had a gun, and cases addressing simulating a

6    gun with one's hands).

7         Plaintiffs counter that Ms. Selto's testimony indicates that Peterson held up his iPhone so

8    she could see what was happening through FaceTime, and she specifically saw one deputy pointing

9    a gun at Peterson and heard "a shocking number of gunshots."  Pls.' Opp. 19.  Further, the parties

10   provide competing expert testimony on whether Peterson pointed his gun or his cell phone. Whether

11   or not Peterson was pointing his gun, holding his phone vertically as if using FaceTime, or holding

12   his phone sideways, "mimicking" a gun, are questions for the jury.

13        Simply put, the evidence before the Court presents a dispute of fact as to whether a

14   reasonable officer in Detective Anderson's position would have believed that he and Detective

15   Brown were in imminent danger when he fatally shot Peterson. The Ninth Circuit has cautioned

16   that excessive force cases pose a "particularly difficult problem" where cases involve the suspect's

17   death, because "the witness most likely to contradict [an officer's] story" is not available to testify.

18   *Gonzalez*, 747 F.3d at 794-95.  Accordingly, the Court "must respect the exclusive province of the

19   jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable

20   inferences from proven facts."  *Long v. Johnson*, 736 F.3d 891, 896 (9th Cir. 2013) (citations

21

22   ───────────────────────────

23   [9] After Peterson fell to the ground, Deputy Feller testified that he never saw Peterson point a gun at anyone, but
     Detective Anderson testified that he saw Peterson sit up and point a gun at Detective Brown. Feller Dep. 106-07, 142,
     ECF No. 55-6; Anderson Dep. 113.

24   ORDER DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

25    - 10

1    omitted).  Viewing the evidence in the light most favorable to Plaintiffs, the Court concludes that a

2    reasonable jury could find that when Detective Anderson fatally shot Peterson, Peterson did not

3    pose an immediate threat to anyone.  Therefore, whether Peterson presented an imminent threat is

4    a question for the jury and precludes summary judgment for Defendants on Plaintiffs' § 1983 claims

5    of excessive force and unreasonable seizure.

6            **C.  Qualified Immunity**

7            Defendants assert that even if Detective Anderson violated Peterson's Fourth Amendment

8    rights by using excessive force, he is entitled to qualified immunity, which is immunity from being

9    sued for conduct undertaken in the course of performing his job.  Defs.' Mot. 13.  Defendants also

10   assert that Deputy Feller is entitled to qualified immunity. *Id.*

11           An officer sued under § 1983 is entitled to immunity from the lawsuit unless it is shown

12   that the officer violated a statutory or constitutional right that was "clearly established" at the time

13   of the challenged conduct. *Plumhoff*, 572 U.S. at 778.  In resolving questions of qualified immunity,

14   courts "engage in a two-step inquiry." *Peck v. Montoya*, 51 F.4th 877, 887 (9th Cir. 2022). One

15   question is whether, "[t]aken in the light most favorable to the party asserting the injury, do the

16   facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S.

17   194, 201 (2001).  The other inquiry is whether, at the time of the alleged constitutional violation,

18   that right was clearly established "in light of the specific context of the case." *Scott v. Harris,* 550

19   U.S. 372, 377 (2007).  A court may use either prong of the qualified immunity test as the starting

20   point. *Hopson v. Alexander*, 71 F.4th 692, 697 (9th Cir. 2023). "If the answer to either question is

21   'no,' then the [officers] are entitled to qualified immunity." *Reichle v. Howards*, 566 U.S. 658, 663

22   (2012).

23

24   ORDER DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

25    - 11

1    While it is preferable to have the question of qualified immunity resolved before trial thus

2    preempting the expense and effort involved in a trial, it is not always the case that this can be done.

3    *See Torres v. City of Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008) (noting that "[w]hile the

4    Supreme Court has encouraged resolution of the qualified immunity issue early on in the lawsuit,"

5    a triable issue of fact may preclude summary judgment on the issue). If, as here, there are factual

6    disputes as to what took place and whether a defendant's conduct violated a plaintiff's constitutional

7    rights, such disputes must be resolved by the jury. *Id.* at 1211; *see also Acosta v. City and Cnty. of*

8    *San Francisco*, 83 F.3d 1143, 1147 (9th Cir. 1996) (noting that "the jury, not the judge, must decide

9    the disputed 'foundational' or 'historical' facts" as to whether a defendant's conduct was

10    unconstitutional).  Nevertheless, a court may grant qualified immunity on summary judgment if it

11    determines that the right at issue was not clearly established at the time the events at issue occurred.

12    *See Pearson v. Callahan*, 555 U.S. 223, 236-42, (2009) (citing circumstances under which "it is

13    plain that a constitutional right is not clearly established but far from obvious whether in fact there

14    is such a right.").

15    Defendants assert that "there is no case law that would tell deputies chasing a man who was

16    indisputably armed, who dropped the gun, and then decided to point his cell phone at them like a

17    gun, that it would be unconstitutional to shoot that man." Defs.' Mot. 13. Plaintiffs argue that

18    Defendants are not entitled to qualified immunity because "the law is clearly established that

19    officers cannot shoot suspects who pose no immediate threat of serious bodily injury or death."

20    Pls.' Opp. 22.

21    A clearly established right should not be defined broadly or "at a high level of generality,"

22    *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), and the right should be "sufficiently clear that every

23    reasonable official would have understood that what he is doing violates that right." *Reichle*, 566

24    ORDER DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

25    - 12

U.S. at 664 (citations omitted). The Supreme Court has confirmed that "a case directly on point [is not required], but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.  Considering the specific factual situation "is especially important in the Fourth Amendment context," because "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Saucier*, 533 U.S. at 205). The Ninth Circuit has explained that "a violation is obvious enough to override the necessity of a specific factual analogue" when "it is almost *always* wrong for an officer in those circumstances to act as he did." *Sharp v. Cnty. of Orange*, 871 F.3d 901, 912 (9th Cir. 2017).

When analyzing the propriety of qualified immunity on summary judgment, the Court must assume that "the version of material facts asserted by the [plaintiff] is correct," but may "consider facts offered by the defendant that are 'uncontradicted by any evidence in the record.'" *Smith v. Agdeppa*, --- F.4th ----, 2023 WL 5600294, at *5 (9th Cir. Aug. 30, 2023) (quoting *Hopson*, 71 F.4th at 697).

According to Plaintiffs, Detective Anderson repeatedly shot at Peterson's back while he was running away, Peterson had committed no violent act and had exhibited no threatening behavior, and Peterson was suspected only of conspiracy to deliver prescription drugs and misdemeanor obstruction.  Here, it is undisputed that Peterson was armed, and there is no evidence on the record to contradict Defendants' testimony that Peterson had the gun in his hand at some point.  However, at the time of the shooting, caselaw would have made it "clear to a reasonable officer" that "a police officer may not use deadly force against a non-threatening individual, *even if the individual is armed*, and even if the situation is volatile." *Est. of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 629 (9th Cir. 2022) (citing *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1227–28 (9th Cir. 2013);

*George v. Morris*, 736 F.3d 829, 832–33, 839 (9th Cir. 2013)) (emphasis added); *see also Curnow By & Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (holding that deadly force was unreasonable where the suspect possessed a gun but was not pointing it at the officers and was not facing the officers when they shot); *Ting v. United States*, 927 F.2d 1504, 1508–11 (9th Cir. 1991) (holding that deadly force was unreasonable where a suspect had dropped his gun); *Briscoe v. City of Seattle*, 483 F. Supp. 3d 999, 1013 (W.D. Wash. 2020) ("[T]he law was 'clearly established' that law enforcement personnel 'may not kill suspects who do not pose an immediate threat to their safety' even if the suspects are armed.") (citing *Van Bui v. City & Cnty. of San Francisco*, 699 F. App'x 614, 616 (9th Cir. 2017)).

According to Plaintiffs' view of the facts, as is required at this stage, Detective Anderson used deadly force against Peterson while Peterson was running away, with his back to Detective Anderson. According to the testimony of witnesses and available video evidence, Peterson never threatened Detective Anderson either verbally or with a weapon. Three of Peterson's four gunshot wounds were "back to front." That the Constitution does not permit the use of deadly force under these circumstances was clearly established at the time of these events, and Detective Anderson would not be entitled to qualified immunity. Further, accepting Plaintiffs' version of the facts around Deputy Feller's shooting at Peterson as he was running, Deputy Feller would not be entitled to qualified immunity based upon the same reasoning.

Finally, according to Plaintiffs' version of the events surrounding the final volley of shots,[10] Peterson was down, although still moving, and was shot when he sat up with his cell phone to show his girlfriend what was happening. He posed no threat to the officers or anyone else at that time.

---

[10] Supported by video evidence interpreted in the light most favorable to Plaintiffs.

ORDER DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

- 14

No warning was given. If a jury determines that Peterson posed no immediate threat at that time, any deadly force Detective Anderson used violated long-settled Fourth Amendment law, and Detective Anderson would not be entitled to qualified immunity. *Zion v. Cnty. of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017) ("We have cases holding that the use of deadly force against a non-threatening suspect is unreasonable. We've also held that continued force against a suspect who has been brought to the ground can violate the Fourth Amendment.").

To be clear, the Court is not concluding that Detective Anderson and Deputy Feller are not entitled to qualified immunity; the Court is ruling that factual questions preclude a grant of summary judgment on the subject, and the issue of whether Defendants should be insulated from personal liability must await trial.

### D. *Monell* Liability

In 1978, the Supreme Court recognized that municipalities and other bodies of local government are "persons" subject to liability under § 1983.[11] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). But a municipality cannot be held liable simply because an employee or agent violated § 1983; it can be "held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403-04 (1997) (citing *Monell*, 436 U.S. at 694). Defendants contend that the County cannot be held liable under a *Monell* theory of liability, because there is no evidence that anyone

---

[11] 42 U.S.C. § 1983 provides: "Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ." (emphasis added).

ORDER DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

- 15

1  ratified an unconstitutional act, and isolated or sporadic incidents do not demonstrate a pattern or

2  practice.  Defs.' Mot. 13; Defs.' Reply 5.

3      A plaintiff may establish municipal liability by demonstrating that an official with final

4  policy-making authority "delegated that authority to, or ratified the decision of, a subordinate."

5  *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 985 (9th Cir. 2002). "If the authorized

6  policymakers approve a subordinate's decision and the basis for it, their ratification would be

7  chargeable to the municipality because their decision is final." *City of St. Louis v. Praprotnik*, 485

8  U.S. 112, 127 (1988). To establish a ratification claim, Plaintiffs must present evidence of a

9  "conscious, affirmative choice" on the part of the authorized policymaker. *Gillette v. Delmore*, 979

10 F.2d 1342, 1347 (9th Cir. 1992)). "A local government can be held liable under § 1983 only where

11 a deliberate choice to follow a course of action is made from among various alternatives by the

12 official or officials responsible for establishing final policy with respect to the subject matter in

13 question." *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010), *overruled on

14 other grounds* by *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (*en banc*).

15 The policymaker must have knowledge of the alleged constitutional violation. *Christie v. Iopa*, 176

16 F.3d 1231, 1239 (9th Cir. 1999).

17     Plaintiffs allege that the County is liable under *Monell* "in that a policy or custom can be

18 inferred from a showing of ratification of an unconstitutional act and CCSD's policies, customs,

19 and established practices."  Compl. ¶¶ 66, 70. Plaintiffs argue that the County Sheriff ratified the

20 deputies' actions, and "[r]atification liability . . . attaches when a final policymaker ratifies a

21 subordinate's unconstitutional action and the basis for it."  Pls.' Opp. 29 (citing *Christie*, 176 F.3d

22 at 1239).  John Horch, who was serving as Sheriff Atkins' Chief Criminal Deputy at the time of the

23 shooting, read all the reports related to the Peterson shooting and found that the use of force was in

24 ORDER DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

25  - 16

1    compliance with the County's policy on the use of deadly force.  Pls.' Opp. 13 (citing Horch Dep.

2    14-16, ECF No. 55-11; Atkins Dep. 5-8, ECF Nos. 55-12).  Mr. Horch, acting as the Sheriff's

3    representative, signed a memo ratifying the shooting, and neither Detective Anderson nor Deputy

4    Feller were disciplined or retrained after the shooting.  *Id.*  Plaintiffs also argue that Clark County

5    has a pattern of ratifying bad shootings and a policy that allows officers to use deadly force even

6    when there is no danger to the public.  *Id.* at 14-16.

7           This Court has previously denied summary judgment on a *Monell* claim under similar

8    circumstances.  *See Thomas v. Cannon*, 3:15-05346 BJR, 2017 WL 2289081, at *13 (W.D. Wash.

9    May 25, 2017) (holding that a rational jury could find that an officer's decision to shoot was not

10   constitutionally justified and the City ratified that unconstitutional decision by determining it was

11   lawful and within policy). Municipalities are required to review police shootings and carefully

12   determine whether the shooting complied with local policy, and then determine whether or not

13   discipline is appropriate. Here, the Court has already found that there is a genuine dispute of

14   material fact about whether excessive force was used in this case. Viewing the evidence presented

15   on summary judgment in a light most favorable to Plaintiffs, the Court finds that a reasonable jury

16   could conclude that Peterson's rights were violated by the use of excessive force, and that the

17   County ratified that unconstitutional act by determining that it was lawful and within policy.

18   Plaintiffs also argue that the County has constitutionally deficient policies, insufficient training, and

19   lack of institutional accountability, issues on which summary judgment is not appropriate.

20   Defendants' motion for summary judgment on Plaintiffs' § 1983 *Monell* claim is denied.

21

22

23

24   ORDER DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

25     - 17

1

2

**E.  State Law Claims – Negligence and Wrongful Death**

Defendants also request summary judgment as to Plaintiffs' state-law claim for negligence,

arguing that the negligence claim must be dismissed because Peterson was committing multiple

felonies when he was shot and killed. Defs.' Mot. 11-12.  Washington's felony bar statute provides:

> In an action arising out of law enforcement activities resulting in personal injury or death, it is a complete defense to the action that the finder of fact has determined beyond a reasonable doubt that the person injured or killed was engaged in the commission of a felony at the time of the occurrence causing the injury or death, the commission of which was a proximate cause of the injury or death.

RCW 4.24.420 (West 2021). Defendants assert that there is no dispute that Peterson was trying to

sell prescription pills (a controlled substance), which is a Class C felony. *Id.* at 12 (citing RCW

69.50.402).  Additionally, Defendants assert that Peterson was committing attempted Assault in

the First Degree and Third Degree, based on his pointing the gun or cell phone. *Id.* (citing RCW

9A.36.011; RCW 9A.28.020; RCW 9A.36.021(g)).

Plaintiffs argue that there were no provable felonies committed by Peterson, and no alleged

crimes at issue were the proximate cause of his death.  Pls.' Opp. 27. Under the circumstances here,

the felony bar rule applies only if the "*finder of fact* has determined beyond a reasonable doubt that

the person injured or killed was engaged in the commission of a felony" and the felony "was a

proximate cause of the injury or death." RCW 4.24.420 (emphasis added).  The Court concludes

that the jury must decide the answers to the questions whether Peterson was committing a felony

and whether the felony was a proximate cause of his death.  This precludes summary judgment on

the state law claim of negligence on the basis of the felony bar rule.  Although Defendants did not

discuss the wrongful death claim, summary judgment is also necessarily precluded on the state law

claim for wrongful death.

ORDER DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

- 18

**F.  Other Claims**

Defendants moved broadly for summary judgment on all claims against all defendants, but they did not address all claims.  The party moving for summary judgment bears the initial burden of showing "the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986). The Court has addressed the arguments made in Defendants' motion but denies without discussion summary judgment on claims not raised. Accordingly, Plaintiffs' Fifth Cause of Action, Deprivation of Familial Relationship, survives summary judgment.

## V.      PLAINTIFFS' MOTION

Plaintiffs seek summary judgment on their excessive force claim against Detective Anderson solely based on the initial shots fired. Pls.' Mot. 6. Defendants submit undisputed evidence that Peterson was armed.  Defendants further point out that Peterson had communicated over social media his intent to shoot any police officer who compromised his drug sale, was attempting to evade arrest by flight, had dropped and retrieved his gun while fleeing, and had been warned to drop the gun or be shot.  Detective Anderson testified that Peterson was ignoring all commands to stop and to drop the gun, was running toward "unsuspecting deputies who had no shield to protect themselves from gunfire," and based on the circumstances, Detective Anderson concluded that Peterson was an imminent threat. Anderson Decl. ¶ 4, ECF No. 42. Detective Anderson declares that he started firing at Peterson to protect the deputies in Peterson's path but did not think he hit Peterson in the first volley of shots.  *Id.*; *see also* Anderson Interview 12-14. Furthermore, Defendants contend that the autopsy evidence shows that Peterson was not shot in the back.  Burt Decl. ¶¶ 3-4.

When considering the "immediate threat" of a suspect who is attempting to evade arrest, it is important to consider the totality of the circumstances "from the perspective of a reasonable

ORDER DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "[P]olice officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. The Court must view the evidence in a light most favorable to Detective Anderson.  Doing so, the Court concludes that a reasonable jury could find that at the time Detective Anderson fired his initial shots, he had reason to believe that Peterson, who was armed and ignoring all commands, presented an immediate threat to the safety of the deputies in his path.  It is the jury's role to ascertain the facts by determining the credibility of the witnesses and weighing the available evidence and testimony. Therefore, Plaintiffs' motion for summary judgment on the excessive force claim against Detective Anderson is denied.

## VI.    CONCLUSION

For the foregoing reasons:

1.  Defendants' Motion for Summary Judgment, on all claims against all Defendants, ECF No. 38, is DENIED;

2.  Plaintiffs' Motion for Summary Judgment on Excessive Force Claim Against Defendant Robert Anderson, ECF No. 45, is DENIED;

3.  The Court GRANTS the parties' stipulated motion, ECF No. 36, and hereby ORDERS that the case caption be amended so that Plaintiff Olivia Selto is no longer listed as an individual claimant but remains in the case caption as the guardian of minor child K.P. and as a Personal Representative of the Estate; and

4.  This case shall proceed to trial.

DATED this 28th day of September 2023.

Barbara Jacobs Rothstein
U.S. District Court Judge

ORDER DENYING PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

- 20